[Cite as *State ex rel. Ohio Academy of Nursing Homes, Inc. v. Ohio Dept. of Medicaid*, 2017-Ohio-8000.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio ex rel. Ohio Academy
of Nursing Homes, Inc., et al.,

        Relators-Appellees,

v.

Ohio Department of Medicaid, et al.,

        Respondents-Appellants.

:
:
:
:
:
:
:
:

No. 16AP-102
(C.P.C. No. 03CV-12970)

(REGULAR CALENDAR)

---

### P L U R A L I T Y   D E C I S I O N

**Rendered on September 29, 2017**

---

**On brief:** *Webster & Associates Co., LPA, Geoffrey E. Webster* and *Bryan M. Pritikin*, for appellees. **Argued:** *Geoffrey E. Webster.*

**On brief:** *Michael DeWine*, Attorney General, *Rebecca L. Thomas*, and *Ara G. Mekhjian*, for appellants. **Argued:** *Rebecca L. Thomas.*

---

    APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J., lead opinion.

{¶ 1} Respondents-appellants, Ohio Department of Medicaid, and its current director, John B. McCarthy, (collectively "Department"[1]) appeal a January 29, 2016 decision of the Franklin County Court of Common Pleas granting two motions to compel responses to questions propounded during several depositions. The Department had objected to the questions during the depositions on the basis of attorney-client privilege and the work product doctrine and instructed the witnesses not to answer. In a plurality

---

[1] By operation of law the Ohio Department of Medicaid succeeded the original respondent in the suit (Ohio Department of Job and Family Services) as the state agency responsible for the administration of Ohio's Medicaid program. R.C. 5162.03; R.C. 5160.011.

decision, the Court finds that some of the questions did not seek material protected by either attorney-client privilege or the work product doctrine, yet other questions did seek material protected by either the privilege or the doctrine. We also find some of the issues to be moot and some of the issues to be not final and appealable. Therefore, the Court dismisses the appeal in part, affirms the trial court's decision in part, and reverses the trial court's decision in part.

## I. FACTS AND RELEVANT PROCEDURAL HISTORY

{¶ 2} This case was originally filed on November 25, 2003 and has an extensive history spanning over a decade but largely not relevant to this appeal. This decision is limited in review to the procedural issues and related information as appealed by the Department.

{¶ 3} The operative complaint, filed on September 25, 2007, consists of a petition for two writs of mandamus and other relief on behalf of a purported class. The relators-appellees, Ohio Academy of Nursing Homes, Inc., Willowood Care Center of Brunswick, Inc., Spring Meadows Care Center, Arcadia Acres, Inc., and Main Street Terrace Care Center (collectively "Nursing Home Group") appear as putative representatives of an alleged class for which certification has been sought but no determination issued. The first writ of mandamus sought would require the Department to consider in a genuine and unbiased fashion whether to approve Medicaid reimbursement to the Nursing Home Group for increased reasonable costs of services provided based on a large rate increase in Ohio Bureau of Workers' Compensation ("BWC") premiums for the period of January 1, 2003 through June 30, 2004. (Sept. 25, 2007 Fourth Amend. Compl. at ¶ 9-31; Feb. 26, 2008 Entry Granting Partial Dismissal at 17-19.) The second writ would require the Department to actually pay to the Nursing Home Group such adjusted rates according to findings favorable to the Nursing Home Group made by the Department regarding the first writ. (Fourth Amen. Compl. at ¶ 33-35, Prayer for Relief.)

{¶ 4} On February 15, 2008, the Nursing Home Group moved for partial summary judgment arguing that it was entitled to the first writ of mandamus because the record showed that the Department had a clear legal duty to raise reimbursement for increased costs due to a "government mandate," BWC's higher premium rate imposed on employers. (Feb. 15, 2008 Mot. for Partial Summ. Jgmt. at 1.) Before any response to the Nursing Home Group's motion, the trial court, acting on a previously briefed motion to dismiss,

dismissed all claims for relief other than the first writ. (Feb. 26, 2008 Entry Granting Partial Dismissal at 17-19.) Three days later, on February 29, 2008, the Department moved for summary judgment. At issue in both summary judgment motions was whether the Department appropriately considered whether to provide additional reimbursement or whether, as the Nursing Home Group alleged, the Department's decision was "a foregone conclusion without any support, in fact or law." (Feb. 15, 2008 Mot. for Partial Summ. Jgmt. at 11.)

{¶ 5} The Nursing Home Group took the depositions of five employees of the Ohio Department of Job and Family Services ("ODJFS") (which was, at the relevant times, the state agency in charge of Ohio's Medicaid program and referred to as the "Department") and also one employee of the BWC. During these depositions, counsel for the Department objected to numerous questions asked on behalf of the Nursing Home Group and cited work product or attorney-client privilege as bases for the objections. The Department instructed the witnesses not to answer on each occasion.

{¶ 6} The Nursing Home Group filed motions to compel responses to the questions and for sanctions on March 19 and 25, 2008. The Nursing Home Group also filed a motion to stay briefing on summary judgment until the trial court had an opportunity to rule on the motions to compel. On April 9, 2008, the trial court granted the stay and set alternative deadlines for the Nursing Home Group to respond to summary judgment depending on whether it granted or denied the motions to compel. The trial court noted, "[a] decision on those motions will be forthcoming shortly." (Apr. 9, 2008 Decision & Entry at 3.)

{¶ 7} Nearly eight years later, on January 29, 2016, the trial court granted both motions to compel and delayed determination of the sanctions motion until the close of discovery. The Department filed a notice of appeal on February 10, 2016. The Nursing Home Group filed a motion to dismiss the appeal. However, in a memorandum decision issued on April 12, 2016, this Court denied the Nursing Home Group's motion. *State ex rel. Ohio Academy of Nursing Homes v. Ohio Dept. of Medicaid*, 10th Dist. No. 16AP-102 (Apr. 12, 2016) (memorandum decision).

## II. ASSIGNMENTS OF ERROR

{¶ 8} The Department posits two assignments of error for our review:

> [1.] The lower court erred by granting the motions to compel based on a misunderstanding of the facts and issues that were properly before it.
>
> [2.] The lower court erred by granting the motions to compel without addressing the Department's arguments, which were meritorious.

In this lead opinion, I address the Department's two assignments of error in reverse order, discussing the law of attorney-client privilege and the work product doctrine generally, and thereafter, organizing the discussion according to the names of the deponents from whom the Nursing Home Group has sought discovery.

## III.  DISCUSSION

### A.  Second Assignment of Error—Whether the Trial Court Correctly Concluded that the Questions Objected to did not Seek Privileged Communications or Work Product

#### 1.  The Attorney-Client Privilege

{¶ 9}    The Supreme Court of Ohio has explained:

> Ordinarily, a discovery dispute is reviewed under an abuse-of-discretion standard. *Tracy v. Merrell Dow Pharmaceuticals, Inc.* (1991), 58 Ohio St.3d 147, 151-152, 569 N.E.2d 875. However, if the discovery issue involves an alleged privilege, as in this case, it is a question of law that must be reviewed de novo. *Med. Mut. of Ohio v. Schlotterer*, 122 Ohio St.3d 181, 2009 Ohio 2496, 909 N.E.2d 1237, ¶ 13.

*Ward v. Summa Health Sys.*, 128 Ohio St.3d 212, 2010-Ohio-6275, ¶ 13.  Insofar as factual issues must be determined by the trial court as a predicate to resolving the legal question of privilege, such factual determinations should be accorded deference.  *MA Equip. Leasing I, LLC v. Tilton*, 10th Dist. No. 12AP-564, 2012-Ohio-4668, ¶ 18.

{¶ 10}  "In Ohio, the attorney-client privilege is governed by statute, R.C. 2317.02(A), and in cases that are not addressed in R.C. 2317.02(A), by common law." *State ex rel. Leslie v. Ohio Hous. Fin. Agency*, 105 Ohio St.3d 261, 2005-Ohio-1508, ¶ 18; *see also, e.g.*, *State ex rel. Dawson v. Bloom-Carroll Local School Dist.*, 131 Ohio St.3d 10, 2011-Ohio-6009, ¶ 27 ("In Ohio, the attorney-client privilege is governed both by statute, R.C. 2317.02(A), which provides a testimonial privilege, and by common law, which broadly protects against any dissemination of information obtained in the confidential attorney-client relationship.").

{¶ 11} The Ohio Revised Code provides for the attorney-client privilege such that:

> The following persons shall not testify in certain respects:
>
> (A)
>
> > (1)     An attorney, concerning a communication made to the attorney by a client in that relation or concerning the attorney's advice to a client, except that the attorney may testify by express consent of the client or, if the client is deceased, by the express consent of the surviving spouse or the executor or administrator of the estate of the deceased client. However, if the client voluntarily reveals the substance of attorney-client communications in a nonprivileged context * * *, the attorney may be compelled to testify on the same subject.

R.C. 2317.02(A)(1).  Although this statute on its face mentions only that certain "persons" are not permitted to "testify," the Supreme Court has explained that the reach of R.C. 2317.02(A)(1) is broader:

> R.C. 2317.02(A) provides a testimonial privilege--i.e., it prevents an attorney from testifying concerning communications made to the attorney by a client or the attorney's advice to a client.  A testimonial privilege applies not only to prohibit testimony at trial, but also to protect the soughtafter [sic] communications during the discovery process.  The purpose of discovery is to acquire information for trial.  Because a litigant's ultimate goal in the discovery process is to elicit pertinent information that might be used as testimony at trial, the discovery of attorney-client communications necessarily jeopardizes the testimonial privilege.  Such privileges would be of little import were they not applicable during the discovery process.

*Jackson v. Greger*, 110 Ohio St.3d 488, 2006-Ohio-4968, ¶ 7, fn. 1.

{¶ 12} Common law provides for the attorney-client privilege such that it can be analyzed according to these numbered factors:

> " '(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection is waived.' " *State ex rel. Leslie v. Ohio*

> *Hous. Fin. Agency*, 105 Ohio St.3d 261, 2005 Ohio 1508, 824 N.E.2d 990, ¶ 21, quoting *Reed v. Baxter*, 134 F.3d 351, 355-356 (6th Cir. 1998); *Perfection Corp. v. Travelers Cas. & Sur.*, 153 Ohio App.3d 28, 2003 Ohio 3358, 790 N.E.2d 817, ¶ 12.

*State ex rel. Lanham v. DeWine*, 135 Ohio St.3d 191, 2013-Ohio-199, ¶ 27. As a result, according to either analysis, statutory or common law, it is the *contents* of confidential communications that is protected.

> [T]he attorney-client privilege applies to communications between attorneys and their clients pertaining to the attorneys' legal advice. *See Thomas* [*v. Ohio State Univ.*, 71 Ohio St.3d 245, 249 (1994)]. "Facts within [the attorney's] own knowledge, rather than confidential communications," are not within the attorney-client privilege. *In re Martin* (1943), 141 Ohio St. 87, 104-105, 47 N.E.2d 388.

*State ex rel. Beacon Journal Publishing Co. v. Bodiker*, 134 Ohio App.3d 415, 424 (10th Dist.1999).

### 2. The Work Product Doctrine

{¶ 13} The work product doctrine offers some protection for materials prepared by attorneys, even if they are not communications of the sort protected by attorney-client privilege. The United States Supreme Court has explained:

> [I]t is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that [(s)]he assemble information, sift what [(s)]he considers to be the relevant from the irrelevant facts, prepare his [or her] legal theories and plan his [or her] strategy without undue and needless interference. * * * This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways -- aptly though roughly termed by the Circuit Court of Appeals in this case as the "work product of the lawyer." Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his [or her] own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served.

*Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947). "Discovery was hardly intended to enable a learned profession to perform its functions either without wits or on wits borrowed from the adversary." *Id.* at 516 (Jackson, J. concurring).

{¶ 14} The Supreme Court of Ohio has explained that "the work-product doctrine provides a *qualified* privilege protecting the attorney's mental processes in preparation of litigation, establishing 'a zone of privacy in which lawyers can analyze and prepare their client's case free from scrutiny or interference by an adversary.' " (Emphasis sic.) *Squire, Sanders & Dempsey, L.L.P. v. Givaudan Flavors Corp.*, 127 Ohio St.3d 161, 2010-Ohio-4469, ¶ 55, quoting *Hobley v. Burge*, 433 F.3d 946, 949 (7th Cir.2006). The Supreme Court has also reasoned that " 'the doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system,' and the privilege afforded by the work-product doctrine is not absolute." *Squire, Sanders & Dempsey* at ¶ 55, quoting *United States v. Nobles*, 422 U.S. 225, 238-39 (1975).

{¶ 15} In Ohio, the work product doctrine also has a basis in rule. Civ.R. 26 provides that:

> [A] party may obtain discovery of documents, electronically stored information and tangible things prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including his attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing of good cause therefor.

Civ.R. 26(B)(3).

> "[A] showing of good cause under Civ.R. 26(B)(3) requires demonstration of need for the materials - i.e., a showing that the materials, or the information they contain, are relevant and otherwise unavailable. The purpose of the work-product rule is '(1) to preserve the right of attorneys to prepare cases for trial with that degree of privacy necessary to encourage them to prepare their cases thoroughly and to investigate not only the favorable but the unfavorable aspects of such cases and (2) to prevent an attorney from taking undue advantage of his adversary's industry or efforts.' Civ.R. 26(A). To that end, Civ.R. 26(B)(3) places a burden on the party seeking discovery to demonstrate good cause for the sought-after materials."

*Squire, Sanders & Dempsey* at ¶ 57, quoting *Jackson* at ¶ 16.

### 3.  Questions Asked During March 17, 2008 Martin Deposition

{¶ 16} Patricia Martin testified that she was employed as the Assistant Deputy Director for Medicaid Operations within ODJFS (the Department) at the relevant time periods.  (Mar. 17, 2008 Martin Dep. at 6.)  Counsel for the Department objected a number of times during the deposition based on the work product doctrine or the attorney-client privilege, but in most instances, the witness answered the question anyway by stating that she did not recall.[2]  *Id.* at 18-25.  However, in one instance Martin refused to answer:

> [BY MR. WEBSTER:]
>
> Q. * * * Do you recall ever meeting with the Director regarding these rate reconsideration requests?
>
> MS. THOMAS: Objection. To the extent that this would involve disclosing work product in anticipation of or because of litigation, I would instruct the witness not to answer if that's the case.
>
> THE WITNESS:  No answer.

*Id.* at 23.

{¶ 17} Attorney-client privilege protects communications between attorneys and clients made for the purposes of obtaining or giving legal advice.  Whether or not Martin met with the director of the Department concerning rate reconsideration requests is not a question that seeks or would elicit privileged communications; it is a simple "yes" or "no" answer that is not subject to confidentiality and nondisclosure because of the privilege.

{¶ 18} Nor does the question require the disclosure of attorney work product.  The Department argues that this question could have included meetings that occurred after the lawsuit was filed.  The Department posits that regardless of when the meetings took place the fact of whether there were meetings could have "shed light on the Department's evaluation of this matter in the context of [] anticipation [of litigation]."  (Apr. 25, 2016 Department's Brief at 32.)  Whether a meeting took place between two employees of ODJFS regarding a request for a rate adjustment which ODJFS was obligated to consider is not an attorney's "interviews, statements, memoranda, correspondence, briefs, mental

---

[2] While some of this deposition conduct is the subject of a motion for sanctions, all that is before us is whether the trial court properly compelled answers to questions over the objections that resulted in the witness's refusal to answer.

impressions, [or] personal beliefs." *Hickman* at 511. Requiring an answer to the question is not an attempt to litigate the case on "borrowed" wits. *Id.* at 516. The trial court did not err when it ordered the Department through its witness to answer to this question.

{¶ 19} All three judges of the panel concur in their review of the trial court's decision concerning the deposition testimony of Martin and join as a majority to overrule the second assignment of error as it relates to the questions asked of Martin at her March 17, 2008 deposition. Accordingly, the trial court's decision and order as to the testimony of Martin is affirmed.

### 4. Questions Asked During March 17, 2008 Weibl Deposition

{¶ 20} Lynne Weibl testified as an employee of ODJFS serving as the Department's in-house counsel. (Mar. 17, 2008 Weibl Dep. at 6-8.) Weibl testified that she had not entered an appearance in the litigation and that the Attorney General's office appeared on its behalf. *Id.* at 9-10. In the deposition, counsel for the Nursing Home Group asked Weibl a series of questions related to a rate adjustment request letter (Nursing Home Group's Ex. 4) and ODJFS' response letter (Nursing Homes Group's Ex. 7). *See* Exs. 4, 7, Feb. 15, 2008 Mot. for Partial Summ. Jgmt. Counsel for the Department, Rebecca Thomas, objected and instructed the witness as follows:[3]

> [BY MR. WEBSTER:]
>
> Q. Do you know who in the Department was assigned the responsibility of reviewing and considering this request?
>
> A. I believe it was Mr. Saxe, Ms. Evers, Mr. Blair.
>
> Q. * * * Did you attend any meetings where [Nursing Home Group]'s Exhibit 4 was the subject of the meeting?
>
> MS. THOMAS: Objection. This may involve a disclosure of work product in anticipation of litigation and/or attorney-client privilege and I will instruct the witness not to answer if that's the case.
>
> THE WITNESS: I cannot answer.

(Weibl Dep. at 10-11.)

---

[3] Although the Nursing Home Group alleged additional improper objections by Thomas in combined motions to compel and for sanctions, I address only those instances in which the witness was instructed not to answer and did not answer.

[BY MR. WEBSTER:]

Q. And do you know who was assigned responsibility in the Department of Job and Family Services to respond to this request?

A. I believe it was Mr. Saxe, Ms. Evers and Mr. Blair.

Q. * * * And did you attend any meetings in which this document was the subject of discussion?

MS. THOMAS: Same objection, work product and/or attorney-client privilege. I am going to instruct the witness not to answer if answering would disclose either of those.

THE WITNESS:  For those reasons, I don't answer.

*Id.* at 11-12.

[BY MR. WEBSTER:]

Q. * * * Who was the author of Exhibit 7, of the content of Exhibit 7?

MS. THOMAS: Objection. This may involve the disclosure of attorney-client privileged communications and/or work product. I am going to instruct the witness not to answer if that is the case.

THE WITNESS: For those reasons, I cannot answer.

*Id.* at 12.

[BY MR. WEBSTER:]

Q. * * * Do you know the name of the individual who actually prepared the content of [Nursing Home Group]'s Exhibit 7?

MS. THOMAS: Objection. To the extent that this would require disclosure of attorney-client privileged communication or work product, I will instruct the witness not to answer.

THE WITNESS: For those reasons, I cannot answer.

*Id.* at 14-15.

[BY MR. WEBSTER:]

Q. * * * Did you author any part of [Nursing Home Group]'s Exhibit 7, the letter that was sent by the Department to me?

MS. THOMAS: Objection. It calls for privileged attorney-client communication and/or work product, and to the extent that it does, I would instruct the witness not to answer.

THE WITNESS: For those reasons, I cannot answer.

*Id.* at 16.

{¶ 21} The Department argues that knowing who participated in meetings about exhibits 4 and 7 could suggest what the Department found significant about the case. (Department's Brief at 26-27.) The Department also argues that whether Weibl participated in drafting exhibit 7 is an attempt to ascertain the content of communications between Weibl and her client, the Department. (Department's Brief at 28-29.)

{¶ 22} But the exhibits that were discussed in Weibl's deposition were correspondence between the parties to the litigation. Exhibit 4 is a letter sent by counsel for the Nursing Home Group to the Department, and exhibit 7 is a response sent by the Department to counsel for the Nursing Home Group. Intentionally exchanged materials between parties are not protected work product or confidential attorney-client communications. Whether or not Weibl authored any part of a letter sent to opposing counsel by the Department, requires a simple "yes" or "no" answer. I would find answering the question involves neither privilege nor work product, since an attorney may be compelled to testify as to otherwise privileged communications "if the client voluntarily reveals the *substance* of attorney-client communications in a nonprivileged context." (Emphasis added.) R.C. 2317.02(A)(1). Neither is it work product. " '[P]roduction of privileged documents to another party waives both the attorney-client privilege and the work product privilege.' " *Komorowski v. John P. Hildebrand Co., L.P.A.*, 8th Dist. No. 101500, 2015-Ohio-1295, ¶ 24, quoting *United States v. Smith*, 245 F.R.D. 605, 613 (N.D.Ohio 2007), citing *In re Columbia/HCA Healthcare Corp. Billing Practices Litigation*, 293 F.3d 289, 304, 306-07 (6th Cir.2002); *see also Foley v. Poschke*, 137 Ohio St. 593, 595 (1941) ("The general rule [is] that communications between an attorney and his [or her] client in the presence of a third person are not privileged."). I would find the

contents of exhibits 4 and 7, which were intentionally exchanged, are not privileged or protected work product, even if the views and concepts they conveyed were also, at some point, what Weibl communicated to her client as in-house counsel or prepared for her client.

{¶ 23} The mere fact of an attorney's involvement is not a matter of privilege or work product. As the Supreme Court of Ohio has explained:

> Ordinarily, an attorney may properly be examined as to the existence of the relation of attorney and client between himself and his client, and as to the terms of that relation.[4]

*In re Martin*, 141 Ohio St. 87, 104 (1943). I find the following is persuasive:

> [T]he attorney-client privilege has never been construed to prevent the disclosure that a person retained the attorney for a particular purpose. *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596, 602 (8th Cir. 1977) (purpose for which law firm retained not privileged). *Accord Colton v. United States*, 306 F.2d 633, 636 (2d Cir. 1962); *Westhemeco Ltd v. New Hampshire Insurance Co.*, 82 F.R.D. 702, 707 (S.D.N.Y. 1979); J. Weinstein & M. Berger, *Weinstein's Evidence Manual* § 18.03[3][d] ("The general rule in the federal courts is that identifying facts about the client, or the scope or objective of the employment, are not treated as confidential communications to which the privilege applies."). Learning that purpose does not necessarily disclose what the client might have told the attorney in confidence once the attorney had been retained. By the same logic, that an agency attorney's advice was sought as to a particular matter is not in itself privileged even if it discloses the client's desire for that advice.

*Evans v. Atwood*, 177 F.R.D. 1, 4 (D.D.C.1997). The particular questions the trial court compelled the Department to answer sought neither privileged communications nor work product. Whether Weibl participated in meetings is a simple fact, not a confidential communication between attorney and client. *Lanham* at ¶ 27. The questions did not progress further to seek what advice Weibl gave or the work product she may have

---

[4] I recognize, however, that Prof.Cond.R. 1.6(a) requires that, "[a] lawyer shall not reveal information relating to the representation of a client, including information protected by the attorney-client privilege." Under this rule, there may be a case an attorney is subpoenaed and compelled to testify on the existence of representation, and an ethical issue may arise about whether to reveal that fact. As far as governmental department counsel is concerned, the relationship is assumed and it is her job to represent the Department and its employees within the scope of their work.

generated. Explicit, intentional disclosures were made in the Department's letter, and whether Weibl participated in the drafting of the letter is within the bounds of discovery. *See also Falcone v. Internal Revenue Serv.*, 479 F.Supp. 985, 990 (E.D.Mich.1979) (holding that "it is clear that the purpose of the privilege is not to protect communications which are statements of policy and interpretations adopted by the agency").

{¶ 24} I would find the questions concerned the mere identities of the persons who authored or saw documents which (by virtue of having been intentionally shared) were not work product or privileged, but were tantamount to a statement of policy by the Department. Such questions seek unprotected facts and do not by their answers extract confidential communications or impermissible insight into litigation strategy. I do not view as error the trial court's decision and order compelling answers to these questions. Accordingly, I would affirm the trial court in its decision and order concerning Weibl's testimony.

{¶ 25} As explained in their separate opinions, Judges Dorrian and Luper Schuster conclude that the trial court erred by granting the motion to compel with respect to the questions asked of Weibl at her March 17, 2008 deposition. Those opinions constitute a majority to sustain the Department's second assignment of error as it relates to that issue. Accordingly, the trial court's decision and order on the same is reversed. Based on the reasoning set forth above, however, I respectfully dissent from the opinion of the majority concerning Weibl's deposition.

**5. Questions Asked During March 20, 2008 Evers Deposition**

{¶ 26} Julie Evers testified as the Assistant Bureau Chief for Long Term Care Facilities in the Office of Ohio Health Plans; as such, she was an employee of the Department and subordinate to Department witness Harry Saxe. (Mar. 20, 2008 Evers Dep. at 6; Saxe Dep. at 6.) The members of this panel reach different conclusions as to two aspects of the objections to questions posed to Evers. Therefore, each aspect will be addressed in turn.

{¶ 27} First, as in Weibl's deposition, counsel for the Nursing Home Group, Geoffrey Webster, asked Evers a series of questions related to ODJFS' response (Nursing Homes Group's Ex. 7) to a request for a rate adjustment (Nursing Homes Group's Ex. 4). *See* Exs. 4,

7, Mot. for Partial Summ. Jgmt.  Counsel for the Department, Thomas, objected and instructed the witness as follows:[5]

> [BY MR. WEBSTER:]
>
> Q. And did you author any part of Exhibit 7, the Department's response, which I believe is in front of you there?
>
> A. Yes.
>
> Q. Which parts did you author? Would you look at that for me, please?
>
> MS. THOMAS: Objection. Instruct the witness not to answer about which parts any particular people had a part in authoring because it's already disclosed that counsel was involved.
>
> MR. WEBSTER: So you are instructing her not to answer the question? Do I understand that correctly?
>
> MS. THOMAS: I'm not sure I remember the question exactly, but I'm instructing the witness not to answer in terms of the content of contributions by various people as individuals, yes.
>
> MR. WEBSTER: I think that would be the question.
>
> Ms. THOMAS: Okay.
>
> THE WITNESS: I am not -- I am unable to answer for the reasons so stated.
>
> MR. WEBSTER: Certify the question.
>
> BY MR. WEBSTER:
>
> Q. Let me ask you this: Do you have -- you seem to have some memory before your counsel instructed you, so it would not be futile to ask a court to consider whether that instruction was appropriate; you would be able to make a response if required to; would you not?
>
> A. I would not be able to tell you which portion I drafted and which portions others drafted.

---

[5] Although the Nursing Home Group alleged additional improper objections by Thomas in combined motions to compel and for sanctions, I address only those instances in which the witness was instructed not to answer and did not answer.

Q. You cannot, you said?

A. I could not. It would have been a collaborative approach and not --

Q. Some of which was counsel and some was not and you can't tell which?

A. Yes.

Q. On whose computer was this document drafted?

A. I believe I developed an initial draft.  However, multiple versions would have -- we would have -- it would have been circulated for comments.

Q. Did you save the versions of the document that went through draft on your system?

A. Quite likely not.

Q. Why not?

A. Because to the extent I was editing a draft I did, I would have written over the previous draft.

Q. So is the version of this letter, Exhibit 7, as it appears as Exhibit 7, is that in your system?

MS. THOMAS: Objection. I would instruct the witness not to answer the question.

(Evers Dep. at 11-13.)

{¶ 28} The document that was the subject of this series of questions is the same document at issue between counsel during Weibl's deposition.  Both Weibl and Evers did not answer questions about this document for primarily the same reasons.

{¶ 29} Materials freely and intentionally exchanged are not protected work product or confidential attorney-client communications.  *See* R.C. 2317.02; *Foley* at 595; *Komorowski* at ¶ 24; Fed.R.Evid. 502(b).  And the questions asked were not even about the content of a document but rather about the identities of people who authored or participated in creating the document and where prior drafts may be located.  Similarly and for reasons already discussed, even the fact that counsel may have participated in authoring part of a document intentionally disclosed, I would find it is not a communication protected

by attorney-client privilege or the work product doctrine for the purposes of learning who prepared the document. Therefore, I would find the trial court did not err in compelling Evers to answer the deposition questions.

{¶ 30} As explained in their separate opinions, Judges Dorrian and Luper Schuster would find to be moot the trial court's holding concerning Evers' deposition testimony as it relates to the questions regarding which portions of exhibit 7 Evers and her colleagues authored. Those opinions constitute a majority to overrule as moot the Department's second assignment of error as it relates to these questions. Accordingly, the trial court's decision and order on the same is affirmed. Based on the reasoning set forth above, however, I respectfully concur in judgment only with the opinion of the majority concerning this portion of Evers' deposition.

{¶ 31} Second, questioning and objections also occurred on another subject in Evers' deposition:

> THE WITNESS: I personally did not talk to anyone at the Department of Workers' Compensation.
>
> BY MR. WEBSTER:
>
> Q. * * * Do you know anybody who did of the group you have identified: Mr. Saxe, Mr. Blair?
>
> MS. THOMAS: Objection. If this would require you to disclose any attorney-client privileged communications or any information developed or obtained in anticipation of or because of litigation, then I would instruct you not to answer.
>
> THE WITNESS: I'm not answering for the reasons --
>
> MR. WEBSTER: Okay.
>
> THE WITNESS: -- so mentioned.

(Evers Dep. at 17.) The question objected to in this exchange plainly asked whether Saxe or Blair communicated with the BWC. Nothing in the question compromises a confidential attorney-client communication, and it is hard to fathom how it would elicit prohibited work product. The Department now argues that the question was overbroad because it did not include a specific limitation as to timing, but an objection on that basis was not argued or even preserved before the trial court, even if it made sense. (Department's Brief at 40.)

This is because the question was limited in scope to "consult[ations] at any time with individuals or documents from the Bureau of Workers' Compensation at the time this [the response to the rate adjustment request] was being considered."  (Evers Dep. at 15.)

{¶ 32}  The questions posed in Evers' deposition did not involve privileged communications or information protected by the work product doctrine, and the objections were improper.  The trial court did not err in compelling answers to these questions.

{¶ 33}  All three judges of the panel concur in their review of the trial court's holding concerning Evers' deposition testimony outlined immediately above and join as a majority to overrule the Department's second assignment of error as it relates to questions of Evers regarding if she, Saxe, or Frank Blair talked to BWC.

{¶ 34}  Accordingly, as explained above, the trial court's decision and order concerning the testimony of Evers is affirmed.

### 6.  Questions Asked During March 20, 2008 Valentino Deposition

{¶ 35}  Tracy Valentino testified as the Chief Fiscal and Planning Officer of the BWC.  (Mar. 20, 2008 Valentino Dep. at 7.)  At no time was she employed by ODJFS or the Department.  *Id.* at 19.  She was not represented by counsel for ODJFS, Thomas.  She was represented by another attorney from the Ohio Attorney General's office.  *Id.* at 2, 19.  During her deposition the following exchange took place:

> [BY MR. WEBSTER:]
>
> Q. Had you had conversation with Ms. Thomas prior to receiving the e-mail from her with the attachment, Exhibit 2?
>
> A. Yes.
>
> Q. * * * And what was that conversation?
>
> MS. THOMAS: Objection. I am going to object on the basis of the work product doctrine and I will instruct the witness not to answer as to the content of my communication with her.

*Id.* at 18.

{¶ 36}  The Department argues that the questions asked of Valentino were aimed at discovering Thomas's legal advice to Valentino or Thomas's legal strategy, thoughts, and impressions on the case.  (Department's Brief at 44-48.)  But Thomas did not represent Valentino.  To the extent that discussion between Thomas and Valentino may have included

information about Thomas's litigation strategy or material Thomas compiled in preparation for the deposition, it might have been shielded by the work product doctrine. Work product protection, if it exists, is not automatically waived by the disclosure of Thomas to Valentino because "disclosure to a person with an interest common to that of the attorney or the client normally is not inconsistent with an intent to invoke the work product doctrine's protection and would not amount to such a waiver." (Internal quotation marks omitted.) *Komorowski* at ¶ 24, quoting *In re Sunrise Sec. Litigation.*, 130 F.R.D. 560, 564 (E.D.Pa.1989); *In re Doe*, 662 F.2d 1073, 1081 (4th Cir.1981). However, "[t]he burden of proof rests with the party asserting the existence of privilege." *Shaffer v. OhioHealth Corp.*, 10th Dist. No. 03AP-102, 2004-Ohio-63, ¶ 8. I would find that the Department made no attempt to set forth in a privilege log or other suitable sealed proffer what the witness would have said in order to establish before the trial court that the question would have elicited a response that was protected by the work product doctrine. Under these circumstances, I would find that the trial court, therefore, did not err in compelling an answer to this question and would overrule the Department's second assignment of error as to the March 20, 2008 Valentino deposition and affirm the trial court.

{¶ 37} As explained in their separate opinions, Judges Dorrian and Luper Schuster conclude that the trial court erred by granting the motion to compel with respect to the questions asked of Valentino at her March 20, 2008 deposition. Those opinions constitute a majority to sustain the Department's second assignment of error as to that issue. Accordingly, the trial court's decision and order on the same is reversed. Based on the reasoning set forth above, I respectfully dissent from the opinion of the majority concerning Valentino's deposition.

### 7. Questions Asked During March 20, 2008 Saxe Deposition

{¶ 38} Harry Saxe testified as the Bureau Chief in Long Term Care on behalf of the Department. (Mar. 20, 2008 Saxe Dep. at 6.) Counsel for the Nursing Home Group, Webster, asked Saxe a series of questions related to ODJFS' response letter (Nursing Homes Group's Exhibit 7) to the Nursing Home Group's request for a rate adjustment. *See* Exs. 4, 7, Mot. for Partial Summ. Jgmt. Counsel for the Department, Thomas, objected and instructed the witness to limit his answers:

[BY MR. WEBSTER:]

Q. Did you author Exhibit 7?

A. I am sure I edited it and reviewed it. I won't claim to be the sole author.

Q. * * * Who do you know to have had input into the words that are presented on Exhibit 7?

MS. THOMAS: Objection. To the extent that this requires you to divulge attorney-client privileged communications or attorney work product, I will instruct you not to answer. You may answer any other parts.

THE WITNESS: I would say, as I said earlier, that Julie Evers worked with me on it and, beyond that, I mean, I don't recall exactly who was engaged in editing, reviewing and -- to create the letter.

BY MR. WEBSTER:

Q. And has any portion of your response been constrained by the instruction of counsel?

A. Yes.

(Saxe Dep. at 11.)

[BY MR. WEBSTER:]

Q. Would you look at Exhibit 7, please.

A. Okay.

Q. Did you compose the second paragraph of Page 1 of that letter?

A. Again, I don't recall that I did or didn't, to be honest with you.

Q. Of this document, what do you recall authoring?

MS. THOMAS: Objection. If this would require you to give any information that leads to knowledge of attorney-client privileged communications, then I would instruct you not to answer.

THE WITNESS: Would you repeat the question again for me, please?

MR. WEBSTER: Sure.

I'll ask you to read it back.

(Question read.)

THE WITNESS: As I think I indicated earlier, the document was -- I edited it, I'm certain of that.  I will do that before signing.  And beyond that, I indicated that Julie Evers had worked on it and I think -- I can't -- again, not -- not knowing what happened -- you know, recalling what happened exactly on August 25th, 2003, and prior to that as we reviewed I this, I can't identify every person who may have looked at this document at that point in time before I signed it.

BY MR. WEBSTER:

Q. Was your answer in any way limited by the instruction of your counsel?

A. Yes.

*Id.* at 27-28.

[BY MR. WEBSTER:]

Q. * * * Did you write that or did someone else write that paragraph?

MS. THOMAS: Objection.

THE WITNESS: Again --

MS. THOMAS: If this would require you to disclose the content of any attorney-client privileged information or work product, I would instruct you not to answer.

THE WITNESS: Again, I would say, as I said earlier, I don't -- I don't know -- recall exactly who wrote what part of this letter. That would be what I would indicate on this.

BY MR. WEBSTER:

Q. So, again, was your answer limited by the instruction of your counsel?

A. Yes.

*Id.* at 31-32.

{¶ 39} I would find that the work product doctrine does not protect the Department from having Saxe answer the Nursing Home Group's questions at Saxe's March 20, 2008 deposition. Exhibit 7, was voluntarily and intentionally shared between the parties. I would find its content was not protected by work product or a privileged attorney-client communication. S*ee* R.C. 2317.02; *Foley* at 595; *Komorowski* at ¶ 24; Fed.R.Evid. 502(b). And the Nursing Home Group's questions about this letter were not about its contents but rather who authored or participated in creating it and the extent of Saxe's participation. As previously noted, even if an attorney had been involved in drafting exhibit 7, no privilege or doctrine shields from discovery the simple fact that an attorney was consulted in drafting a document which is not, itself, protected by privilege or the work product doctrine.

{¶ 40} Further, an exchange took place later in the deposition that renders Thomas's objections harmless. This exchange clarifies that Saxe's answers to Webster's questions were actually complete and not limited:

> MR. WEBSTER: I'll certify the questions he did not answer and we will continue the deposition until we submit to the court for a ruling on those.
>
> Thank you, Mr. Saxe.
>
> MS. THOMAS: Could I say something on the record, please? I'm not sure that the witness understood your question when you asked if the answers were limited. I'm not sure if the answers were different than they would have otherwise been based on my instruction versus just knowing that there was a limit put out there by me, an in case the former is the case, we could avoid the second deposition. Maybe you could ask the question again. That would be my suggestion.
>
> MR. WEBSTER: I choose not to.
>
> MS. THOMAS: Okay. I wanted to suggest it on the record. Thank you.
>
> MR. WEBSTER: I don't think he misunderstood the questions. Mr. Saxe is quite experienced both at being deposed, and being deposed by myself as well, and I think he knows quite well that,

if he doesn't understand something, that in my experience with him, he sure as heck won't answer it.

MS. THOMAS: My point was: He might have thought he understood you and did not; not that he would have known he misunderstood you. But that is your choice. I just wanted to raise it in a time-saving effort.

MR. WEBSTER: I'll ask him since you have prompted him well enough.

BY MR. WEBSTER:

Q. Was there something about the questions posed to you, Mr. Saxe, that you did not understand, as opposed to your counsel perhaps not understanding?

A. Well, let me clarify, if I could, if that's appropriate.

Q. That might be helpful since you have been coached to clarify.

A. No. I was thinking about that, to be honest with you, as I was answering the question.

Q. Uh-huh.

A. I would not answer the questions significantly different than I have said to you; that -- that I don't recall who all was involved in this drafting of the letter for the past -- since it is, again, a five-year-old issue, but I also am cognizant of the fact that there are limits to which I could go as a result of, you know, the -- the warning from counsel; but substantively, it is the same; my answer is going to be the same regardless of that admonition.

Q. Well, then, let me ask you directly: Was your counsel involved in drafting this letter?

A. I honestly don't recall. I would -- I would indicate to you that there's a -- there's a likelihood that there was some involvement but I don't honestly recall what happened, who contributed to the drafting of this letter five years ago.

MR. WEBSTER: Okay. Thank you.

*Id.* at 33-35.  Under any circumstance, Saxe can only be compelled to testify to what he remembers.  He could not remember who drafted which part of exhibit 7.  I would find the trial court correctly concluded that the objections to these questions were not appropriate.

However, I would also find the trial court erred in not considering that the witness clarified that Thomas's objection had no effect on his testimony, rendering the inappropriate objection harmless.

{¶ 41} As explained in their separate opinions, Judges Dorrian and Luper Schuster would find to be moot the Department's second assignment of error as it relates to the deposition testimony of Saxe. Those opinions constitute a majority to overrule as moot the Department's second assignment of error as it relates to that issue. Accordingly, the trial court's order and decision as to the same is affirmed. Based on the reasoning set forth above, however, I respectfully concur in judgment only with the opinion of the majority concerning Saxe's deposition.

### 8. Questions Asked During March 21, 2008 Jones Deposition

{¶ 42} Kevin Jones testified that he was an employee of ODJFS during the relevant time period. (Mar. 21, 2008 Jones Dep. at 5.) He was responsible for supervising staff who addressed reimbursement rate change requests. *Id.* at 8-9. The members of this panel reach different conclusions as to two aspects of the objections to questions posed to Jones. Therefore, each aspect will be addressed in turn.

{¶ 43} First, counsel for the Nursing Home Group, Webster, asked a series of questions to which counsel for the Department, Thomas, objected and instructed Jones not to answer.

> [BY MR. WEBSTER:]
>
> Q. * * * Have you had any involvement with the government mandate requests at issue in this action subsequent to their filing and your conversation with Mr. Blair in mid-2003?
>
> MS. THOMAS: Objection to the extent that this -- that answering that question would divulge attorney-client communication or information obtained or produced in anticipation of or because of litigation. Then, to that extent, I instruct you not to answer. Otherwise, you will answer.
>
> THE WITNESS: Based on my attorney's advice, then I decline to answer.

*Id.* at 14.

{¶ 44} The Department argues that because the Nursing Home Group filed suit soon after the decision was made on the rate request, "Mr. Jones' role–or even lack of role–would

be information about how the Department prepared for, handled, or evaluated this case," and thus, work product. (Department's Brief at 42.) It is possible that Jones's answer might have included discussions with counsel or other protected activity, but it is also perfectly possible that Jones's answer might have included no such information.

{¶ 45} "The burden of proof rests with the party asserting the existence of privilege." *Shaffer* at ¶ 8. The Department did not meet such burden. Therefore, the trial court did not err in compelling an answer to this question.

{¶ 46} All three judges of the panel join as a majority to overrule the Department's second assignment of error as it relates to the above questions asked of Jones at his March 21, 2008 deposition. Accordingly, we affirm the trial court's decision and order on the same.

{¶ 47} Second, another exchange with Jones occurred in this deposition:

> [BY MR. WEBSTER:]
>
> Q. You have been identified as a witness to testify in this action. Were you aware of that?
>
> MS. THOMAS: Objection.
>
> THE WITNESS: Yes.
>
> BY MR. WEBSTER:
>
> Q. And what is the subject upon which you are going to provide testimony?
>
> MS. THOMAS: Objection. To the best of my recollection, he is not listed as a witness for trial in our initial witness list submitted in December. And if I'm right about that, then I would instruct the witness not to answer.
>
> MR. WEBSTER: Well, before you instruct him not to answer and we end up in some big hassle that perhaps we don't need to, let's take a look at -- in response to Interrogatory Number 5, state the names of all witnesses you intend to call, Mr. Jones' name is listed.
>
> MS. THOMAS: Aren't those discovery responses that we provided in 2005, that have since been superseded by a witness list we submitted in December?

MR. WEBSTER: You identified him as a witness. He just said he understood he was going to be a witness.

MS. THOMAS: I believe -- I believe, at least I understood he had been named as a witness. I don't believe he answered he understood he would be a witness.

MR. WEBSTER: Would you read his response back?

(Testimony read.)

BY MR. WEBSTER:

Q. * * * What is the subject upon which you expect to provide testimony?

MS. THOMAS: Objection.

Could we have a quick break, please?

MR. WEBSTER: No. After he answers the question, but not until then.

MS. THOMAS: Okay. We do not intend to call Mr. Jones as a witness at trial in this matter at this time. So I'd instruct the witness not to answer the question.

MR. WEBSTER: Certify the question.

We will continue the deposition, then, after we file the motion to compel with respect to same.

Thank you, Mr. Jones. We will be seeing you again.

THE WITNESS: All right.

(Jones Dep. at 14-16.)

{¶ 48} I would find whether or not Jones was to be a witness at trial, Civ.R. 30(A) permits him to be deposed on questions within the scope of discovery. Even if the Department was attempting to assert some form of privilege in instructing the witness not to answer, the record does not reveal a cognizable basis for instructing Jones not to answer this question. In the absence of a legitimate reason to instruct the witness not to answer, the Nursing Home Group was entitled to a response.

{¶ 49} As explained in their separate opinions, Judges Dorrian and Luper Schuster find the trial court's order as it relates to the deposition testimony of Jones, regarding

whether he would be a witness and his testimony if he were to be, not final and appealable. Accordingly, the second assignment of error as to this issue is dismissed as not final and appealable. Based on the reasoning set forth above, however, I respectfully dissent from the opinion of the majority concerning this portion of Jones's deposition.

{¶ 50} Accordingly, as explained above, the trial court's decision and order concerning the testimony of Jones is affirmed in part, and the second assignment of error as to Jones' deposition is dismissed in part.

### B. First Assignment of Error—Whether the Trial Court Erred in Granting the Motions Because the Material Sought by the Questions was Irrelevant to the Issues in the Case

{¶ 51} According to its first assignment of error, the Department argues that the trial court erred in compelling answers to the discovery questions because the questions sought information about material that is not relevant to the relief sought by the Nursing Home Group. (Department's Brief at 17-21.)

{¶ 52} However, I would find the Department's basis for objection before the trial court was not relevance but privilege and work product. Therefore, I would find that the appellate court has jurisdiction. In doing so, I would hold that the Department has waived this assignment of error. I further note that, even without waiver, it is the Department's burden to establish a basis for refusal to answer on grounds of relevance. *Frash v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 14AP-932, 2016-Ohio-360, ¶ 28, quoting *Union Sav. Bank v. Schaefer*, 10th Dist. No. 13AP-222, 2013-Ohio-5704, ¶ 46 (" 'The party resisting discovery bears the burden of demonstrating to the trial court that the requested information would *not* meet th[e] standard [of relevance set forth in Ohio Rule of Civil Procedure 26(B)(1)].' "). (Emphasis sic.) I would point out that at no time did the Department submit a privilege log, sealed proffer, or other appropriate materials to the trial court to demonstrate entitlement to protection from discovery for relevancy under Civ.R. 26.

{¶ 53} As explained in their separate opinions, Judges Dorrian and Luper Schuster find the first assignment of error to be not final and appealable. Accordingly, the first assignment of error is dismissed as not final and appealable. Based on the reasoning set forth above, however, I respectfully dissent from the opinion of the majority regarding the first assignment of error.

## IV.  CONCLUSION

{¶ 54} The Department's first assignment of error is dismissed as not final and appealable, with Judge Brunner dissenting.  The Department's second assignment of error is dismissed in part, sustained in part, and overruled in part as follows:

- Martin deposition – overruled in its entirety, all panel members concurring,

- Weibl deposition – sustained in its entirety, Judge Brunner dissenting,

- Evers deposition – overruled as moot in part, Judge Brunner concurring in judgment only; overruled in part, all panel members concurring,

- Valentino deposition – sustained in its entirety, Judge Brunner dissenting,

- Saxe deposition – overruled as moot, Judge Brunner concurring in judgment only,

- Jones deposition – overruled in part, all panel members concurring; dismissed in part as not final and appealable, Judge Brunner dissenting.

{¶ 55} Accordingly, the first assignment of error and the second assignment of error as to Jones in part are dismissed.  The decision and order of the trial court is affirmed in part on the basis of our overruling various parts of the Department's second assignment of error as set forth herein, and the trial court's decision and order is reversed in part on the basis of our sustaining various parts of the Department's second assignment of error as set forth above.

*Judgment affirmed in part and reversed in part.*

BRUNNER, J., writing the lead opinion and concurs in part and dissents in part.
DORRIAN, J., concurs in part with lead opinion, writes for the majority in part.
LUPER SCHUSTER, J., concurs in part with the lead opinion and concurs in part with DORRIAN, J., partial majority opinion.

DORRIAN, J., concurring in part with the lead opinion, and writing for the majority in part.

{¶ 56} I concur with the majority and the lead opinion and would overrule the second assignment of error as to the following:

- The deposition testimony of Patricia Martin

- The deposition testimony of Julie Evers regarding if she, Harry Saxe, and Frank Blair talked to BWC

- The deposition testimony of Kevin Jones, at 14, regarding his answer to the question "Have you had any involvement with the government mandate requests at issue in this action subsequent to their filing and your conversation with Mr. Blair in mid-2003?"

Therefore, as set forth in the conclusion of the lead opinion, the second assignment of error as to the above is overruled.

{¶ 57} Because the questions were ultimately answered, we find to be moot and decline to address the second assignment of error as to the following:

- The deposition testimony of Julie Evers regarding which portions of Exhibit 7 she authored

- The deposition testimony of Harry Saxe

Therefore, as set forth in the conclusion of the lead opinion, the second assignment of error as to the above is overruled as moot.

{¶ 58} Because the Department did not assert a privilege which would make the trial court's holding on such objection to be final and appealable, we find to be not final and appealable the second assignment of error as to the following:

- The deposition testimony of Kevin Jones regarding whether Jones would be a witness and what his witness testimony would be

- The first assignment of error

Therefore, as set forth in the conclusion of the lead opinion, the second assignment of error as to the above is dismissed as not final and appealable.

{¶ 59} We sustain the second assignment of error as to the following:

- The deposition testimony of Lynne Weibl

- The deposition testimony of Tracy Valentino

{¶ 60} As to Weibl's deposition testimony, the attorney-client privilege and/or the work-product privilege applied. The Supreme Court of Ohio has held:

> Simply stated, an attorney does not become any less of an attorney by virtue of state agency employment. That is so even if the attorney's position includes performance of nonlegal or so-called ministerial duties. The privilege applies when legal advice of any kind is sought from the legal advisor in that capacity and the client's confidential communication relates to that purpose.
>
> Therefore, in Ohio, the attorney-client privilege extends to government agencies consulting with in-house counsel for legal advice or assistance.

*State ex rel. Leslie v. Ohio Hous. Fin. Agency*, 105 Ohio St.3d 261, 2005-Ohio-1508, ¶ 29-30.

{¶ 61} Furthermore, the Supreme Court has defined the scope of the privilege as follows:

> [T]he privilege is not narrowly confined to the repetition of confidences that were supplied to the lawyer by the client. That cramped view of the attorney-client privilege is at odds with the underlying policy of encouraging open communication; it poses inordinate practical difficulties in making surgical separations so as not to risk revealing client confidences; and it denies that an attorney can have any role in fact-gathering incident to the rendition of legal advice and services. The attorney-client privilege does not require that the communication contain purely legal advice, but if a communication between a lawyer and client would facilitate the rendition of legal services or advice, the communication is privileged.
>
> In particular, in *Toledo Blade*, we held that an attorney's factual investigation, if incident to or related to any legal advice that the attorney would give on a particular issue, is covered by the privilege.

(Quotations and citations omitted.) *State ex rel. Lanham v. DeWine*, 135 Ohio St.3d 191, 2013-Ohio-199, ¶ 29-30.

{¶ 62} The trial court erred in compelling Weibl to answer the deposition questions as the answers were covered by attorney-client privilege and/or work-product privilege. Therefore, as set forth in the conclusion of the lead opinion, the second assignment of error as to the deposition of Weibl is sustained and the trial court's judgment regarding the same is reversed.

{¶ 63} As to Valentino's deposition testimony, the work-product privilege applied. Therefore, the trial court erred in compelling Valentino to answer the deposition questions as the answers were covered by the work-product privilege. Therefore, as set forth in the conclusion of the lead opinion, the second assignment of error as to the deposition of Valentino is sustained and the trial court's judgment regarding the same is reversed.

LUPER SCHUSTER, J., concurs as to ¶ 57 through ¶ 63.
BRUNNER, J., concurs in judgment only as to ¶ 57, and
dissents as to ¶ 58 through ¶ 63.

LUPER SCHUSTER, J., concurring in part with the lead opinion and concurring in part with Judge Dorrian's partial majority opinion.

{¶ 64} I concur with the lead opinion and would overrule the second assignment of error as to the following:

- The deposition testimony of Patricia Martin

- The deposition testimony of Julie Evers regarding if she, Harry Saxe, and Frank Blair talked to BWC

- The deposition testimony of Kevin Jones regarding his answer to the question "Have you had any involvement with the government mandate requests at issue in this action subsequent to their filing and your conversation with Mr. Blair in mid-2003?" (Jones Dep. at 14.)

{¶ 65} I concur with the partial majority opinion of Judge Dorrian as to the remaining issues.